## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

EQUAL EMPLOYMENT OPPORTUNITY      )
COMMISSION,                       )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        1:09CV654
                                  )
GKN DRIVELINE NORTH AMERICA, INC., )
                                  )
                Defendant.        )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter comes before the undersigned United States Magistrate Judge for a recommendation on a Motion for Summary Judgment (Docket Entry 13) filed by Defendant GKN Driveline North America, Inc. ("GKN"). For the reasons set forth herein, GKN's Motion for Summary Judgment should be denied.

## I. FACTS[1]

This action arises out of a meeting that GKN's employees conducted with then-employee, Dwayne Butler, regarding a drug test and Butler's subsequent discharge. (See Docket Entry 1.) GKN operates a facility in Sanford, North Carolina, at which it forges steel. (Docket Entry 13-4 (McNeill Dep.) at 15:6-17:4.)[2] GKN has

---

[1] Consistent with the authority in the Discussion section below, the recited facts reflect the evidence in the light most favorable to Plaintiff. Whether a reasonable fact-finder ultimately would credit the cited evidence or would view it in any particular light remains a question for another day.

[2] The parties have both attached the same depositions to their summary judgment filings. (See Docket Entries 13 & 15.) For purposes of consistency, the Court will refer to the depositions attached to Docket Entry 13. Additionally, the Court will cite these and other attachments by their Case Management/Electronic Case Filing ("CM/ECF") system numbers, because some depositions have been broken up into more than one part.

a "Substance Abuse" policy that provides for random testing of all employees. (Docket Entry 13-4 at 36:4-24; Docket Entry 17-1 (Dep. Exs.) at 4-6.)[3] According to the policy, an employee who produces a test result that is positive for the presence of prohibited substances is temporarily suspended until the employee can produce a negative specimen and is referred to the company's "Employee Assistance Program" for a dependency assessment. (Docket Entry 13-4 at 36:6-14; Docket Entry 17-1 at 8.) If an employee produces a second positive test result, GKN fires the employee. (Docket Entry 13-4 at 36:6-14; Docket Entry 17-1 at 8.) An employee's refusal to comply with the policy's testing requirements also constitutes grounds for termination of employment. (Docket Entry 13-4 at 36:6-14; Docket Entry 17-1 at 8.)

Prior to 2006, GKN conducted these tests only by urinalysis, but, in 2006, it added a saliva test after problems arose with the urinalysis testing process. (Docket Entry 13-6 (Howell Dep.) at 28:21-29:16; Docket Entry 13-7 (Pelshaw Dep.) at 15:10-16:2.)[4] Using the urinalysis testing, GKN was receiving "abnormal test results" which included: "not consistent with human urine, inconclusive, tampered, adulterated and some diluted tests."

---

[3] The policy also requires substance abuse testing under other circumstances including, but not limited to: prior to employment with GKN; upon reasonable suspicion of substance abuse; and after an accident. (Docket Entry 13-4 at 36:4-24; Docket Entry 17-1 (Dep. Exs.) at 6.) The Court refers to the deposition exhibits by the CM/ECF page number in the footer on each document, because some exhibits do not have other page numbers. (See Docket Entry 17-1.)

[4] GKN used a separate entity to conduct the testing. (Docket Entry 13-6 at 21:13-22:1, 37:25-38:3.)

(Docket Entry 13-6 at 32:3-10; Docket Entry 13-7 at 15:10-16:2.)[5] GKN also discovered that some employees were purchasing products that would permit them to pass drug tests. (Docket Entry 13-6 at 35:13-36:8; Docket Entry 13-7 at 15:10-16:2.) GKN fired employees whose test results came back as "not consistent with human urine," "adulterated," or "inconclusive," because it considered those responses indicative of tampering. (Docket Entry 13-7 at 19:11-21:7.) GKN did not consider a "dilute" result as an indication of a tampered, positive, or "true negative" result. (Id. at 23:8-14.)

On June 9, 1996, Butler began working for GKN at its Sanford facility. (Docket Entry 13-2 at 25:7-17.) He served as a Departmental Helper and, in that capacity, assisted with various tasks, such as oiling machines, helping with preventative maintenance, or cleaning floors (Docket Entry 13-2 at 27:18-29:14), and acted as the cleaning crew team leader (id. at 31:1-32:13). Prior to his hiring, Butler took a drug test which came back negative. (Docket Entry 13-5 (McNeill Dep.) at 84:15-19.)

Before any conflict between GKN and Butler over testing, Butler underwent twelve more tests (Docket Entry 17-1 at 12-31):

1-3) on March 30, 1999, December 14, 2000, and July 11, 2002, Butler took tests which all returned with "negative" results (Docket Entry 13-5 at 84:25-85:24; Docket Entry 17-1 at 12-17);

---

[5] "Dilute" samples lack a sufficient amount of creatine in the urine (Docket Entry 13-7 at 21:12-18, 23:8-14), or specific gravity (Docket Entry 13-6 at 34:12-23). The dilute tests automatically register as negative, because the specimen lacks a sufficient concentration of urine. (Id. at 88:2-15.)

4-5) on October 3, 2003, Butler provided two separate samples; the temperature of the first specimen was too low and the second sample indicated a dilute specimen (Docket Entry 13-5 at 86:4-87:14; Docket Entry 17-1 at 18-19);

6-7) on November 21, 2003, and June 15, 2004, Butler took tests that came back negative (Docket Entry 13-5 at 89:4-90:13, 91:4-17; Docket Entry 17-1 at 20-21);[6]

8) on June 23, 2005, Butler took a test which was identified as positive for marijuana (Docket Entry 13-2 at 43:17-44:2; Docket Entry 13-5 at 91:22-92:5; Docket Entry 17-1 at 22-23);

9) on July 11, 2005, Butler provided another specimen which was dilute (Docket Entry 13-5 at 96:18-97:4; Docket Entry 13-6 at 66:13-67:5; Docket Entry 17-1 at 24);[7]

---

[6] GKN asserts that the November 21, 2003 test was returned as negative (Docket Entry 14 at 3 (citing Docket Entry 17-1 at 12-31)), but its cited evidence lacks information regarding the test result (Docket Entry 17-1 at 20).

[7] Despite the dilute result, GKN allowed Butler to return to work. (Docket Entry 13-5 at 96:18-97:4.) One GKN employee, Tracy McNeill, interpreted the result as "negative" (Docket Entry 13-5 at 96:18-97:4), another former employee, Lori Howell, identified the result as both "negative" and "dilute" (Docket Entry 13-6 at 66:13-67:5). During Howell's deposition, the following exchange occurred:

> Q. Why would the company have accepted a result of a dilute to return an employee to work from a positive drug test?
>
> A. At that point we had not been receiving a lot of dilutes and really didn't know how to handle them. I -- that's when I started talking with Capri[ Pelshaw, GKN's senior corporate counsel,] as to, you know, these certain dilutes are coming back, you know, what do we do because it's not a negative or a positive. And at the time she said, you know, you're right, its not and we don't have, you know, anything at this point so we need to bring them all back.

(Docket Entry 13-4 at 67:6-25 (emphasis omitted).)

10-11) on October 25, 2005, and November 1, 2005, Butler took tests that produced negative results (Docket Entry 13-5 at 97:10-15, 97:20-25; Docket Entry 17-1 at 25-26); and

12) on July 27, 2006, Butler provided a saliva sample for a drug test which was negative (Docket Entry 13-2 at 49:17-50:10; Docket Entry 13-5 at 98:11-16; Docket Entry 17-1 at 27).

In the spring of 2007, Butler and his wife began talking with an individual named Miss Gloria about Santeri'a. (Docket Entry 13-3 (Butler Dep.) at 94:17-97:8, 98:1-99:16.) According to Butler, based upon a book and a conversation with Miss Gloria (and subsequent to the saliva test that he took in 2006), he learned that Santeri'a practitioners do not believe in allowing others to possess their saliva. (Docket Entry 13-3 at 110:8-15, 131:19-25.)[8]

---

[8] Butler recounted these matters as follows:

A. . . . [Miss Gloria] was like . . . when once you started in the religion, just don't give your saliva to anybody. Then, I told her about my job, I said, "Well, they do saliva testing."
    She was like . . . if you're going to be in a religion, and she explained . . . they basically can do certain things with it because it was your blessings or your power in the religion.

Q. In other words, your understanding of what she was saying was that if somebody else has your saliva, they can use it against -- to do things against you?

A. Yes. Or like say, if I had luck, they can basically take my luck. If they want to make bad things happen to me. If they want to control me, they can control me. Different things like that.

Q. And you say you also -- you've seen it in one of the books you have?

A. Yes.

(Docket Entry 13-3 at 110:8-111:14 ("sic" in original).)

In August 2007, Butler and his wife began attending monthly meetings on the religion and he was "initiated" into it on October 26, 2007. (Docket Entry 13-3 at 100:25-101:23, 103:6-13, 104:7-17.)

On July 12, 2007, Butler was paged for a drug test and stood in a line of people going into the nurse's station. (Docket Entry 13-2 at 29:15-18, 56:16-19, 56:22-58:9.) While waiting, Butler overheard someone make the statement, "I'll just take the swab test basically because it's faster." (Id. at 61:13-62:12.)[9] When Butler's turn came, he said to Lori Howell, GKN's occupational nurse: "'Lori because of my religion, I would rather take the urinalysis than the swab test.' And then she said, 'Oh, okay, baby, no problem.'" (Docket Entry 13-2 at 60:7-11; Docket Entry 13-6 at 9:13-16.)[10] According to Butler, Howell informed the testing company representative that he was "'going to take the urinalysis[.]'" (Id. at 60:12-15.) Butler provided a urine specimen. (Id. at 66:4-5.) Within a couple days, Howell told Tracy McNeill, a GKN Human Resources employee: "'I want to bring

---

[9] The term "swab test" refers to testing via saliva specimen.

[10] Howell recalls that Butler stated "'I don't want to take the saliva, you know, it's against my religion.' And [Howell] . . . said, 'It's okay, we're doing urines today.'" (Docket Entry 13-6 at 72:15-19.) According to Howell, only urine testing was occurring that day. (Id. at 72:24-73:6.) Based on a portion of the Response filed by the Equal Employment Opportunity Commission ("EEOC") discussing the July 19, 2007 meeting, GKN asserts that the EEOC "insinuates that on July 12, 2007, Howell 'agreed' to permit Butler to take a urinalysis rather than a saliva test because of Butler's religious objection." (Docket Entry 16 at 3 (citing Docket Entry 15 at 6).) GKN argues that "the undisputed facts in the record do not support the claim that Howell 'agreed' to Butler's request or that she accommodated Butler's religious objection." (Id. at 3.) The undersigned Magistrate Judge does not construe the EEOC's Response as "insinuat[ing]" that GKN, through Howell, previously accommodated Butler.

to your attention that [Butler] came to me and said that it was against his religion to do the swab testing.'" (Docket Entry 13-4 at 20:12-23; Docket Entry 13-5 at 102:24-103:1.)[11]

Butler's July 12, 2007 test result was returned as dilute. (Docket Entry 13-5 at 103:23-104:13; Docket Entry 13-6 at 75:13; Docket Entry 17-1 at 30.) On July 19, 2007, Howell met with McNeill and they decided to seek "a clean specimen." (Docket Entry 13-5 at 103:25-104:8; Docket Entry 13-6 at 75:13-14, 75:21-76:1.) McNeill and Howell called Capri Pelshaw, GKN's senior corporate counsel, about Butler's religious objection to the saliva test and their desire to retest via saliva "to ensure that we did not get another diluted sample." (Docket Entry 13-5 at 104:9-16; Docket Entry 13-6 at 76:24-77:7; Docket Entry 13-7 at 6:15-17.) Pelshaw informed McNeill and Howell that they could ask Butler to retake the test and could "inquire as to his religion and/or what type of accommodation we might provide[.]" (Docket Entry 13-5 at 104:17-21; Docket Entry 13-6 at 77:8-16; Docket Entry 13-7 at 34:4-35:10.)[12]

---

[11] McNeill's position at the time of the incident is not clear. In 2007, she moved from the role of Human Resources Generalist to a Human Resources Manager for the Sanford Forge. (Docket Entry 13-4 at 20:12-23.) The parties refer to her as a generalist (Docket Entry 14 at 6; Docket Entry 15 at 2), but their citations to her deposition do not clarify the matter.

[12] The transcript from Howell's deposition reflects that she recalled Butler saying "he did want to do saliva because it was against his religion." (Docket Entry 13-6 at 75:25-76:1.) Based on the remainder of the sentence, the surrounding contextual information, and McNeill's deposition, it appears that "did" should read "didn't." (Docket Entry 13-4 at 20:14-23; Docket Entry 13-5 102:24-103:1; Docket Entry 13-6 at 75:13-76:8.) Howell also stated that she could not remember whether she spoke with McNeill on July 17th or July 19th (Docket Entry 13-6 at 75:13-15), but that, after talking with McNeill, they both spoke with Pelshaw and then Butler (id. at 79:6-10). Because McNeill and Howell
(continued...)

McNeill and Howell also spoke with Brian Galpin, GKN's regional human resources director, to inform him that: Butler's test result was diluted; Butler had previously expressed a religious objection to the saliva test; they were going to request Butler re-test; they had talked with Pelshaw and were going to talk with Butler. (Docket Entry 13-5 at 108:5-9; Docket Entry 13-6 at 78:7-24; Docket Entry 13-8 (Galpin Dep.) at 8:3-7, 29:15-32:2.)

According to Butler, on July 19, 2007, he met with McNeill and Howell and one of them said that his test was "inconclusive," whereupon he responded:  "'If it's inconclusive, the only thing that can be in my urine is water,' . . . [']if I drank too much water, I'll take the test again.'" (Docket Entry 13-2 at 67:16-19, 69:15-18, 70:13-71:16.)  McNeill then said:  "'We're going to need you to take the swab test.'" (<u>Id.</u> at 73:20-21.)  Butler responded: "'I told [Howell] last week about my religion and she said it was okay, she agreed to it.'  And [McNeill] said, 'I'm sorry, but you're going to have to take the swab test." (<u>Id.</u> at 74:1-5.)

Howell then posed the question, "'What's your religion.'  And [Butler] said, 'Santeria.'" (<u>Id.</u> at 74:6-8.)  Howell replied:  "'I ain't never heard of that.'" (<u>Id.</u> at 74:9-10.)  McNeill stated that Butler's "'not taking this test is like refusing to take a drug test'" and then she added:  "'you can be -- I might have to take your badge for it.'" (<u>Id.</u> at 74:13-17.)  Butler retorted: "'I'll give you blood or I'll give you a sample of my hair whatever

<hr />

[12](...continued)
met with Butler on July 19th (Docket Entry 13-5 at 110:21-22), their initial discussion also must have occurred that same day.

if you want but I can't do the saliva test.'" (<u>Id.</u> at 74:22-25.)
Butler decided, "if I have to take the saliva test, then I will
just reach you my batch [sic] and I reached in [sic] my badge and
she took it" (<u>id.</u>); Butler then left the premises before McNeill
could contact another employee to escort him out of the facility
(<u>id.</u> at 76:25-77:19).[13]    Later that day, Butler went to the

---

[13] According to Howell, those final events unfolded in response to
McNeill's remark, "'I need to understand why this religion is against the saliva
screenings.'" (Docket Entry 13-6 at 80:22-24.)  The EEOC does not concede that
McNeill elicited Butler's reaction with such a question (Docket Entry 15 at 15.)
Similarly, McNeill's and Howell's account of the meeting differs from Butler's.

McNeill claims that she told Butler that he had produced a diluted
specimen, she wanted to provide him with an opportunity to retake the test, "and
the best way to get a clean specimen that won't be diluted is to do the swab
test." (Docket Entry 13-5 at 112:9-14.)  Butler responded:  "'I can't do the
swab test, it's against my religion.'" (<u>Id.</u> at 112:15-16.)  When Howell asked,
"'What is the name of your religion?' He said, 'Santeria.'" (<u>Id.</u> at 112:16-18.)
According to McNeill, the following exchange then occurred:

[McNeill] said, "Can you help us better understand what about your
religion prohibits this so I can figure out what kind of
accommodation we need to make?"  And [Butler] said, "It's not about
my fucking religion.  I'm not taking the fucking test."
    And [McNeill] said, "Dwayne, I'm giving you an opportunity to
explain to me what I can do to help you."  . . . "I want to give you
an opportunity to produce another test.  What can I do to help you?
What about your religion is prohibiting this?"
    [Butler responded:]  "I told you, it's not about my fucking
religion.  Take my fucking blood."  He stood up, he started getting
very loud.  "Take my blood, take my hair.  I'll give you my fucking
badge before I take a swab test."  So I said, "Are you refusing to
take the test?  If you are refusing to take the test, I'll have to
get your badge and I will have to ask Kyle to escort you out."
    [Butler replied:]  "Oh, now you're going to treat me like a
criminal, have somebody escort me out?  This is fucking ridiculous."
And he was standing up and loud and said, "I'll give you my badge
and I'm not having anybody escort me out.  I'll walk out myself."
And as he was walking out, I called Kyle to ask him to come and make
sure he gets out and that he leaves the premises.

(<u>Id.</u> at 112:20-113:16.)

(continued...)

laboratory that GKN used for drug tests, took a urinalysis, and received a negative result. (Id. at 79:6-81:16, 85:23-86:15.)

McNeill and Howell met with Pelshaw to talk about their meeting with Butler. (Docket Entry 13-5 at 116:6-23; Docket Entry 13-6 at 82:12-20; Docket Entry 13-7 at 37:15-40:18.) Pelshaw asked them for a written statement, which they subsequently provided. (Docket Entry 13-5 at 128:25-129:8; Docket Entry 13-6 at 82:15-83:3; Docket Entry 13-7 at 37:19-22; Docket Entry 17-1 at 28-29.) They also spoke with Galpin about the meeting with Butler. (Docket Entry 13-5 at 120:17-121:1; Docket Entry 13-6 at 82:12-14; Docket Entry 13-8 at 35:12-37:17.) McNeill also talked with Charles Corwin, the plant manager. (Docket Entry 13-4 at 22:13-17; Docket Entry 13-5 118:1-4.) Pelshaw, Galpin, McNeill, and Corwin collectively decided to terminate Butler's employment (Docket Entry 13-7 at 55:20-56:2; Docket Entry 13-8 at 38:16-40:22) for refusing to take the drug test (Docket Entry 13-7 at 45:7-10; Docket Entry 13-8 at 38:25-39:6; Docket Entry 17-1 at 31 (termination form)).

On July 20, 2007, Butler called McNeill and informed her that he took a urinalysis test, but she explained that she could not

_____

[13](...continued)
Howell recounted that, after Butler "was talking about his religion," she asked Butler the name of his religion and he answered Santeria. (Id. at 79:6-18.) According to Howell, McNeill asked Butler to "elaborate a little bit further on his religion. He then proceeded to say, . . . it's not about his -- 'my fucking religion. I'm not taking the saliva screening. I will give you my blood, I will do urine, but I'm not going to do the saliva.'" (Id. at 79:21-80:1.) Howell reported that McNeill asked him to elaborate again, "He then again repeated . . . 'Fuck it. It's not about my fucking religion. I'm not doing this.' And then [McNeill] said, 'Are you refusing?' And he said, 'No, I'm not refusing the damn test, I told you I would do everything but the saliva.'" (Id. at 80:2-8.) Howell averred that McNeill then said Butler needed to turn in his badge and that they would contact him. (Id. at 80:11-13.)

accept that test result; he then called Howell and she refused to accept the result. (Docket Entry 13-3 at 82:13-83:14, 86:16-87:1, 87:18-21; Docket Entry 13-5 at 121:16-24.) Butler thereafter spoke with McNeill, who was on a speaker phone with Howell in the room; during that phone call, someone told Butler of his firing. (Docket Entry 13-3 at 87:21-88:1, 88:16-25; Docket Entry 13-5 at 121:24-122:25; Docket Entry 13-6 at 85:9-24.)

Butler spoke with Galpin about the events of July 19, 2007, including the account of McNeill and Howell. (Docket Entry 13-3 at 92:15-93:2; Docket Entry 13-8 at 42:8-15.) Galpin said he would verify with McNeill and Howell what happened and call Butler back, which he did early the next week. (Docket Entry 13-3 at 93:3-23; Docket Entry 13-8 at 42:15-42:22, 47:19-48:8.) Galpin said that McNeill and Howell adhered to their version of the events and Butler responded, "'Oh, okay then'" and ended the conversation. (Docket Entry 13-3 at 94:1-9; Docket Entry 13-8 at 47:22-48:3.)

The Equal Employment Opportunity Commission ("EEOC") filed a Complaint alleging that GKN violated 42 U.S.C. § 2000e-2(a) by refusing to accommodate Butler's religious beliefs by allowing him to submit to an alternative form of drug testing. (Docket Entry 1, ¶ 8.) GKN has moved for summary judgment. (Docket Entry 14.)

## II. DISCUSSION

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ.

P. 56(a). A genuine, material factual dispute exists if the evidence presented could lead a reasonable fact-finder to return a verdict in favor of the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986). A factual dispute qualifies as material only if it might affect the outcome of the case under the governing law. <u>Id.</u> at 248. The Court must view the evidence and any reasonable inferences drawn from the evidence in a light most favorable to the nonmoving party. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

The moving party may discharge its burden by identifying an absence of evidence to support the nonmoving party's case. <u>See Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986). <u>Accord Simmons-Blount v. Guilford County Bd. of Educ.</u>, No. 1:06CV944, 2010 U.S. Dist. LEXIS 34485, at *8-9 (M.D.N.C. Apr. 7, 2010) (unpublished) (Beaty, C.J.). The non-moving party must then "set forth specific facts showing that there is a *genuine issue for trial.*" <u>Matsushita Elec. Indus. Co.</u>, 475 U.S. at 586-87 (citation omitted) (emphasis in original). The nonmoving party must convince the Court that evidence exists upon which a finder of fact could properly return a verdict in favor of the nonmoving party. <u>Anderson</u>, 477 U.S. at 252 (citation omitted). <u>Accord Simmons-Blount</u>, 2010 U.S. Dist. LEXIS 34485, at *8-9. <u>See also Francis v. Booz, Allen & Hamilton, Inc.</u>, 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law.").

B.  Prima Facie Case of Religious Accommodation

Under Title VII of the Civil Rights Act of 1964, "[i]t shall be an unlawful employment practice for an employer . . . to discharge any individual, . . . because of such individual's . . . religion . . . ." 42 U.S.C. § 2000e-2(a). "Religion" is defined to "include[] all aspects of religious observance and practice, as well as belief . . . ." 42 U.S.C. § 2000e(j). The United States Court of Appeals for the Fourth Circuit therefore has recognized that an employee may utilize a "disparate treatment" or "failure to accommodate" theory in asserting religious-based claims under Title VII. Chalmers v. Tulon Co. of Richmond, 101 F.3d 1012, 1017 (4th Cir. 1996). In this case, the EEOC has asserted a religious accommodation claim. (Docket Entry 1, ¶ 7.)

A plaintiff may establish a prima facie religious accommodation claim by showing that: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement." Id. at 1019 (internal quotation marks omitted). "If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not accommodate the plaintiff's religious needs without undue hardship." Id. "To satisfy its burden, the employer must demonstrate either (1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances or (2) that such accommodation was not provided because it would have

caused an undue hardship . . . ." EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307, 312 (4th Cir. 2008).[14]

## C. Analysis

GKN contends that the EEOC has not satisfied the notice prong of the religious accommodation prima facie case. (Docket Entry 14 at 13-18.) The EEOC responds that Butler provided adequate notice of a religious conflict with the saliva test. (Docket Entry 15 at 14-16.) GKN also asserts that the EEOC must prove that GKN "engaged in intentional discrimination against Butler 'because of' his religious beliefs" and that the facts do not show that GKN was "motivated by religious animus or bias." (Docket Entry 14 at 18-19.) The EEOC counters that it need not "show discriminatory intent or motive in the manner suggested by [GKN] . . . ." (Docket Entry 15 at 19-20.)

### 1.  Notice Prong of the Prima Facie Case

GKN asserts that the EEOC "is not able to establish a prima facie case in this action because the undisputed facts show that Dwayne Butler did not provide Defendant with even the minimal information needed for Defendant to determine if it was required to provide Butler with an accommodation to his religious beliefs." Docket Entry 14 at 13.) GKN's argument consists of two parts: (a)

---

[14] Under a "failure to accommodate" theory "an employee can establish a claim even though she cannot show that other (unprotected) employees were treated more favorably or cannot rebut an employer's legitimate, non-discriminatory reason for her discharge." Chalmers, 101 F.3d at 1018. "This is because an employer must, to an extent, actively attempt to accommodate an employee's religious expression or conduct even if, absent the religious motivation, the employee's conduct would supply a legitimate ground for discharge." Id.

whether Butler gave sufficient notice; and (b) whether Butler failed to respond to proper inquiries seeking "further information." (See id. at 13-18.)

### a.  Sufficiency of Notice

According to GKN, Butler "failed to provide the information from which Defendant could determine its obligation to provide an accommodation." (Docket Entry 14 at 15.)  The EEOC responds that Butler put GKN "on notice that its requirement of saliva testing conflicted with [his] religious belief." (Docket Entry 15 at 15.)

The Fourth Circuit has stated that an employee must present "evidence that she informed her employer that her religious needs conflicted with an employment requirement and asked the employer to accommodate her religious needs." Chalmers, 101 F.3d at 1019.  In this regard, an employee's notification must provide the employer with "an opportunity to take reasonable steps to accommodate an employee's conflict." Cary v. Carmichael, 908 F. Supp. 1334, 1343 (E.D. Va. 1995), aff'd sub nom. Cary v. Anheuser-Busch, Inc., 116 F.3d 472 (4th Cir. 1997) (decision without published opinion). "[I]f an employee states only that his religion, for example, prevents him from sending mail, . . . and does not elaborate further, the employer has no hint of how it should proceed to accommodate the employee." Id. at 1343.

In Cary, the plaintiff stated that he would provide a urine sample for a drug test, but he objected to signing a testing consent form based on his status as a Baptist minister, id. at 1338, and refused to clarify the nature or basis of his objection,

id. at 1344. The court explained that the plaintiff "failed to
fulfill his duty to cooperate by failing to give the Company enough
information to merely comprehend his objection to signing the
consent form . . .[,]" id. at 1345, and held, therefore, that the
plaintiff did not satisfy the notice requirement, id. at 1346.

In this case, Butler has submitted evidence that he stated to
Howell on July 12, 2007:  "'Lori because of my religion, I would
rather take the urinalysis than the swab test.'" (Docket Entry 13-
2 at 60:7-11; Docket Entry 13-6 at 9:13-16.)  Further, according to
Butler, on July 19, 2007, he told McNeill and Howell, "'I told
[Howell] last week about my religion and she said it was okay, she
agreed to it.'"  (Docket Entry 13-2 at 74:1-5.)  In addition,
Butler's testimony reflects that he identified his religion as
Santeri'a to Howell and McNeill.  (Docket Entry 13-2 at 74:6-8.)
Finally, Butler claims he said: "'I'll give you blood or I'll give
you a sample of my hair whatever if you want but I can't do the
saliva test.'"  (Id. at 74:22-25.)  Based on this evidence, a
reasonable fact-finder could conclude that Butler notified McNeill
and Howell that his religious beliefs conflicted with the saliva
test and that said conflict could be accommodated.

Other courts have found that information provided to an
employer similar in its level of detail to the information in
Butler's statements created a genuine issue of material fact
regarding the sufficiency of notice.  For example, in one case, the
plaintiff received an ultimatum to cut his hair.  Sistrunk v.
Camden Cnty. Workforce Inv. Bd., No. 1:05-cv-1506 (RBK), 2007 WL

-16-

1175701, at *4 (D.N.J. Apr. 18, 2007) (unpublished). According to the plaintiff, he thereafter told a supervisor "that he could not cut his hair because of his 'way of life[,]'" informed a secretary that "he could not cut his hair because of his Rastafarian beliefs[,] and . . . she discussed the issue on Plaintiff's behalf with members of Defendant's staff." Id. The plaintiff's friend also contacted the defendant's executive director and "explained the nature of the conflict involving the plaintiff's hair." Id. at *2 n. 4, & 4. The district court concluded that the plaintiff had raised a material dispute as to the notice issue. See id. at *5.

Defendants cite Lorenz v. Wal-Mart Stores, No. SA-05-CA-0319 OG (NN), 2006 WL 1562235 (W.D. Tex. May 24, 2006) (unpublished), aff'd, 225 Fed. Appx. 302 (5th Cir. 2007), to show that Butler's statements amounted to insufficient generalized statements. (Docket Entry 14 at 14-15.) In Lorenz, an employee wore attire to work that conflicted with the employer's dress code policy. Id. *2. The plaintiff asserted that he made a statement to the store manager that "basically your [sic] kinda telling me that I shouldn't believe in God the way I do, because this is how I believe in God[.]" Id. at *8 (first bracket in original). The store manager testified that he did not have specific knowledge of plaintiff's religious beliefs. Id. at *10.

Lorenz is distinguishable because, as set out in the Facts section, Butler made a more explicit connection between his religion and the saliva test than the plaintiff in Lorenz drew between his dress and his religion and proposed accommodations.

Moreover, unlike in <u>Lorenz</u>, GKN's employees understood that Butler had a religious conflict with the saliva test. (Docket Entry 13-5 at 102:23-103:1 (Howell told McNeill: "'I want to bring to your attention that [Butler] came to me and said that it was against his religion to do the swab testing.'"); Docket Entry 13-6 at 77:20-24 (Pelshaw suggested that Butler take a saliva test and Howell explained: "'Well, you know, [Butler] did mention to me something about the religion[.]"); Docket Entry 13-7 at 34:13-15 ("They also shared with [Pelshaw] that [Butler] had said something about it being against his religion to take a saliva test . . . .").)

GKN contends that Butler's July 12, 2007 statement "failed to provide information from which Defendant could determine its obligation to provide accommodation." (Docket Entry 14 at 15.) More specifically, GKN asserts that "Butler did not identify the religion[.]" (<u>Id.</u>) GKN has not offered any authority for examining the July 12th statement separate from the July 19th discussion in which he identified his religion as Santeri'a. (<u>See</u> <u>id.</u>) Moreover, Butler's testimony would support an inference that McNeill was determined to insist on the saliva test, notwithstanding any religious objections. (<u>See</u> Docket Entry 13-2 at 74:1-5 (averment by Butler that, after he raised the issue of religious conflict, McNeill stated: "'I'm sorry, but you're going

to have to take the swab test.'").)[15]  As a result, GKN's argument on this point does not entitle it to judgment as a matter of law.

In addition, GKN complains that Butler did not provide it "with any basis for understanding the nature of [his] alleged religious objection or why it prevented him from providing his saliva for a drug test." (Docket Entry 14 at 15.)  According to GKN, it "did not know whether Butler's objection was to the use of a cotton swab or to the method being used to collect his saliva, to having a foreign object placed inside of his mouth, or to sharing his saliva with another person." (Docket Entry 16 at 2.)  The EEOC responds that Butler objected to providing saliva for a saliva swab test and that he suggested alternatives.  (Docket Entry 15 at 17.)  As previously outlined, a reasonable fact-finder could conclude that Butler's statements gave GKN sufficient information for it to recognize the religious conflict and to consider an accommodation.[16]

_____

[15] Further, GKN has failed to explain how events would have unfolded differently if Butler had referenced the name of his religion during his exchange with Howell on July 12, 2007.  Butler has presented evidence that, when he did identify his religion by name on July 19, 2007, Howell responded that she had "never heard of that." (Docket Entry 13-2 at 74:9-10.)

[16] The EEOC asserts that "[t]he instant case can be likened to Sabbatarianism cases, where the very statement that one cannot work on a particular day because of religion, provides notice to the employer of the conflict and need for accommodation." (Docket Entry 15 at 17.)  The EEOC cites cases as examples in a footnote, but does not discuss them.  (Id. at 17 n.7).  GKN, without citation to authority, asserts that Sabbatarianism cases "involve relatively well-known and well understood religious days of observance." (Docket Entry 16 at 2.)  Because a basis exists to find that Butler's notice to GKN provided sufficient information as to his religious objection and need for accommodation, the Court need not resolve this debate over the comparability of Butler's situation to Sabbatarianism cases.

## b.  Further Information

GKN also argues that it had a right to "seek further information from Butler regarding his alleged religious objection to the saliva swab test[.]" (Docket Entry 14 at 15.) The discussion that follows first addresses GKN's reasoning regarding its right to inquire further. It then considers what "further information" GKN requested and if Butler sufficiently responded.

### i.  Basis For Requesting Further Information

According to GKN, it had a right to seek further information from Butler based on his prior submission to a saliva test and guidance in the EEOC Compliance Manual. (Docket Entry 14 at 15-16.)

### I.  Prior Saliva Test

GKN asserts that it "had the right to seek further information from Butler regarding his alleged religious objection to the saliva swab test, particularly in light of his participation in a saliva test without objection less than one year prior to the July 12, 2007 test." (Docket Entry 14 at 15.) The EEOC responds that "GKN is attempting to use the notice requirement as a back door to attack the sincerity and legitimacy of Butler's religious beliefs." (Docket Entry 15 at 17 n.6.) Moreover, the EEOC describes GKN's reference to the prior drug test as an attempt "to cast aspersions on Butler's character" and "irrelevant" (because it pre-dated his practice of Santeri'a). (Docket Entry 15 at 10.)

It does appear that GKN's contentions involve an assertion that it had reason to doubt that Butler had a religious belief that conflicted with submission to a saliva test on July 19, 2007. For

purposes of this motion, however, GKN has stipulated away any challenge as to whether Butler sincerely held a particular religious belief on July 19, 2007, that conflicted with taking the saliva test. (Docket Entry 14 at 13 n.4.) Moreover, Defendant does not cite evidence that its employees sought additional information regarding the nature of Butler's objection to taking a saliva test on July 19, 2007, as a consequence of his prior submission to such testing. Further, the record does not show that GKN, through its employees, asked Butler to explain why he could not provide a saliva test when he had previously done so. (Docket Entry 13-2 at 67:16-77:19; Docket Entry 13-5 at 112:9-113:18; Docket Entry 13-6 at 79:6-81:19; Docket Entry 17-1 at 28-29.)[17]

Under these circumstances, Butler's prior saliva drug test does not represent a factor relevant to the "right" of GKN to seek "further information."

## II. EEOC Compliance Manual

GKN cites various statements regarding religious accommodation in the EEOC Compliance Manual as a basis for asserting a "right to seek further information from Butler regarding his alleged religious objection to the saliva test . . . ." (Docket Entry 14

_____

[17] In its brief, GKN also discussed Butler's prior drug test results. (Docket Entry 14 at 3-4.) According to the EEOC, "[t]he only issue raised by Defendant's brief is whether Butler gave Defendant adequate notice of his religion, to which Butler's past drug test results is wholly irrelevant." (Docket Entry 15 at 10.) In its Reply, GKN stated: "Butler's prior drug testing history is necessary context to understanding Defendant's need to obtain further information about whether his objection to the swab test was genuinely religious in nature." (Docket Entry 16 at 4 (emphasis added).) Understood in this fashion, the parties' disagreement about the relevance of the prior drug tests does not appear relevant to the disposition of this Motion.

at 15.)[18]  First, GKN references Section 12-IV.A.1. of the EEOC

Compliance Manual (see Docket Entry 14 at 15), which provides:

> An applicant or employee who seeks religious
> accommodation must make the employer aware both of the
> need for accommodation and that it is being requested due
> to a conflict between religion and work.  The employee is
> obligated to explain the religious nature of the belief
> or practice at issue, and cannot assume that the employer
> will already know or understand it.  Similarly, the
> employer should not assume that a request is invalid
> simply because it is based on religious beliefs or
> practices with which the employer is unfamiliar, but
> should ask the employee to explain the religious nature
> of the practice and the way in which it conflicts with a
> work requirement.
>
> No "magic words" are required to place an employer
> on notice of an applicant's or employee's conflict
> between religious needs and a work requirement. . . .
> However, the applicant or employee must provide enough
> information to make the employer aware that there exists
> a conflict between the individual's religious practice or
> belief and a requirement for applying for or performing
> the job.

EEOC Compliance Manual § 12-IV.A.1.: Religious Discrimination (July

22, 2008) (emphasis added).[19]

The foregoing provision requires an employee to identify "the

religious nature of the belief" to the extent necessary to inform

---

[18] The EEOC argues that GKN is "attack[ing] the sincerity and legitimacy of Butler's religious beliefs." (Docket Entry 15 at 17 n.6.)  According to the EEOC, "[a]n employer will ordinarily face a difficult task in challenging an employee's religious belief, no matter how unconventional the asserted belief may be."  (Docket Entry 15 at 17 n.6.)  In light of GKN's previously-referenced stipulation that, for purposes of this Motion, it concedes Butler had a bona fide religious objection to the saliva test, the undersigned Magistrate Judge does not interpret GKN's argument as "challenging" Butler's religious belief and, therefore, the discussion that follows will not address the EEOC's arguments based on that premise (see id.).

[19] Other courts have granted deference to the EEOC Compliance Manual in deciding issues.  See, e.g., Kennedy v. Villa St. Catherine's, Inc., 709 F. Supp. 2d 404, 411 (D. Md. 2010).

-22-

the employer of the employee's "need for accommodation" due to a religious conflict and permits employers to seek clarification in the event of confusion. Accordingly, to the extent GKN's employees lacked familiarity with religious objections to saliva testing, the EEOC Compliance Manual authorized them to request clarification from Butler. However, for reasons discussed in the next subsection, a material question of fact exists as to whether Butler sufficiently responded to GKN's inquiries relevant to its understanding of his religious need for accommodation.

GKN also references a portion of Section 12-IV.A.2. (see Docket Entry 14 at 15-16); said provision states:

> In addition to placing the employer on notice of the need for accommodation, the employee should cooperate with the employer's efforts to determine whether a reasonable accommodation can be granted. . . .
>
> Where the accommodation request itself does not provide enough information to enable the employer to make a determination, and the employer has a bona fide doubt as to the basis for the accommodation request, it is entitled to make a limited inquiry into the facts and circumstances of the employee's claim that the belief or practice at issue is religious and sincerely held, and that the belief or practice gives rise to the need for the accommodation.

EEOC Compliance Manual § 12-IV.A.2. (emphasis added). As stated above, for purposes of this motion, GKN has waived arguments regarding Butler's possession of a bona fide religious objection to the saliva test. Therefore, to the extent GKN had the right to seek further information based on the foregoing statements in the EEOC Compliance Manual, that right has no bearing on the issues in dispute via the instant Motion.

Finally, GKN relies on a portion of section 12-I.A.3. (<u>see</u> Docket Entry 14 at 16), underlined below:

> Because the definition of religion is broad and protects beliefs and practices with which the employer may be unfamiliar, the employer should ordinarily assume that an employee's request for religious accommodation is based on a sincerely-held religious belief. <u>If, however, an employee requests religious accommodation, and an employer has an objective basis for questioning either the religious nature or the sincerity of a particular belief or practice, the employer would be justified in seeking additional supporting information</u>.

EEOC Compliance Manual § 12-I.A.3. (emphasis added). Again, because GKN has waived any challenge as to whether Butler held a bona fide religious objection to the saliva test, the cited language has no relevance to the matters at issue in the current Motion (Docket Entry 14 at 13 n.4).

### ii. Butler's Response to Requests for Further Information

According to GKN, on six occasions, Butler forewent the opportunity to explain the basis of his religious objection to providing saliva. (Docket Entry 14 at 16-17.) The first such occasion occurred when McNeill allegedly asked Butler "to explain the religious basis for his objection to the saliva test." (<u>Id.</u> at 16.) GKN asserts that "Butler does not deny" that McNeill asked him that question, "[r]ather, Butler admitted that he does not remember . . . and conceded that she may have asked for an explanation. Despite this admission, Butler did not testify that he offered any explanation for why his religious convictions would not permit him to provide his saliva." (<u>Id.</u> at 16-17 (internal citations omitted).) The EEOC contends that the record supports

-24-

the view that only Howell asked for clarification (specifically regarding the name of Butler's religion, which Butler identified as Santeri'a). (Docket Entry 15 at 15.) The facts, when viewed in a light most favorable to Butler, would allow a fact-finder to conclude that the only inquiry about Butler's religion came from Howell when she posed the question, "'What's your religion?'" (Docket Entry 13-2 at 74:6-7), to which he gave the response, "'Santeria.'" (Docket Entry 13-2 at 74:6-8). GKN has failed to cite any authority that Butler's testimony that he did not remember McNeill asking other questions about his religion would require a fact-finder to credit other evidence that she asked such questions.

In GKN's view, Butler's other missed opportunities for explaining why his religion conflicted with saliva testing include: after McNeill stated on July 19, 2007, that a refusal to take the saliva test could result in his firing; during the phone calls he made to McNeill and Howell on July 20, 2007; or during his discussions with Galpin. (Docket Entry 14 at 16-17.) GKN has not shown that, on any of those occasions, its employees asked Butler to explain his religious conflict with the saliva test. (See Docket Entry 14 at 17.) Moreover, Butler has averred that, with respect to the foregoing phone conversations, he "did not volunteer anything about [his] religion . . . because [he] did not know that the company needed additional information." (Docket Entry 15-2 (Butler Aff.) ¶¶ 9-10.) Because a reasonable fact-finder could conclude that Butler answered all the questions he was asked, GKN has not shown that Butler failed to cooperate.

In sum, GKN has not shown that Butler provided insufficient notice of the religious basis of his objection, given that the record would support the view that Butler reported his religious conflict with the saliva test, proposed accommodations to that conflict, and answered the sole inquiry seeking clarification.

### c. Summary

Butler's account of his statements on July 12 and 19, 2007, create a genuine dispute as to whether he notified GKN of a religious conflict with its saliva drug test and provided sufficient information to allow GKN to consider accommodations. To the extent the EEOC Compliance Manual provided a basis for GKN to seek additional information relevant to the matters disputed in the instant motion, a genuine dispute exists as to whether GKN asked for additional information from Butler which he failed to provide. Accordingly, GKN has not shown an entitlement to judgment as a matter of law based on the EEOC's failure to satisfy the second prong of the prima facie case for religious accommodation claims.

### 2. Intentional Discrimination

GKN's next arguments appear as follows:

> In order to establish a violation of Title VII, Plaintiff must prove that the Defendant engaged in intentional discrimination against Butler "because of' his religious beliefs. The fact that the statute permits a claim to be based on an employer's failure to make accommodation does not read the requirement of proof of intentional discrimination out of the statute. Rather, [sic] *Ricci v. DeStefano*, __ U.S. __, 129 S. Ct. 2658, 2673 (2009) ("A disparate treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action.") "The phrase 'because of' in this context implies the religious

animus that the Civil Rights Act was developed to prevent." *Cary v. Carmichael*, 908 F. Supp. at 1346.

(Docket Entry 14 at 18-19 (emphasis in original).) According to the EEOC, this argument "attempts to read in *Ricci* a holding which was not intended." (Docket Entry 15 at 19.)

In that case, the United States Supreme Court held that, by discarding the results of a test for fire department promotions, a city violated Title VII. <u>Ricci</u>, 129 S. Ct. at 2664. The city had made extensive efforts to create a test for the position of lieutenant or captain that would not unintentionally favor members of the majority racial group; nevertheless, the test results disproportionately excluded black and Hispanic candidates and, as a result, the city's Civil Service Board declined to certify the examinations. <u>Id.</u> at 2665-71. Candidates that passed the examinations brought claims for violation of the disparate-treatment prohibition in Title VII. <u>Id.</u> at 2671. The city argued, among other things, that had they certified the results they would have faced disparate-impact claims under Title VII. <u>Id.</u>

The Supreme Court held that, "under Title VII, before an employer can engage in intentional discrimination for the asserted purpose of avoiding or remedying unintentional disparate impact, the employer must have a strong basis in evidence to believe it will be subject to disparate-impact liability if it fails to take the race-conscious, discriminatory action." <u>Id.</u> at 2677. The city's "fear" of disparate-impact litigation did not justify the city's discarding of the test. <u>Id.</u> at 2681. As a result, the

Supreme Court found that the city violated the plaintiffs' rights by subjecting them to disparate treatment based on race.  Id.

In support of its position that the EEOC must present evidence of intentional discrimination to avoid summary judgment, GKN relies on a quote from Ricci in which the Supreme Court distinguished between disparate treatment and disparate impact cases in stating that "[a] disparate-treatment plaintiff must establish 'that the defendant had a discriminatory intent or motive' for taking a job-related action." Id. at 2672 (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986 (1988)).  (Docket Entry 14 at 18.)  This case, however, involves not a disparate treatment claim, but rather a religious accommodation claim: "Defendant engaged in unlawful employment practices . . . in violation of . . . 42 U.S.C. § 2000e-2(a) when it refused to accommodate the religious beliefs and practices of Dwayne Butler . . . ." (Docket Entry 1, ¶ 7 (emphasis in original).)[20]  This distinction dooms GKN's argument that the EEOC must prove intentional discrimination in this case.

GKN's position starts from a proper premise: from the time of Title VII's enactment, its "central provisions" have prohibited employers from treating employees differently "because of" their religion just as those statutory provisions banned differential treatment "because of" race, color, sex, and national origin.  See

---

[20] At one point, the EEOC's brief uses the term "disparate treatment religious accommodation case." (Docket Entry 15 at 20.)  A search of electronic legal databases revealed no references to "disparate treatment religious accommodation."  One could envision such a claim arising under circumstances where an employer accommodates conflicts related to some religions, but not others.  However, the EEOC has not alleged any such claim in this case.

<u>Ansonia Bd. of Educ. v. Philbrook</u>, 479 U.S. 60, 63 n.1 (1986). However, GKN's instant argument falters because it overlooks an important distinguishing feature of Title VII's proscriptions regarding religion: "Section 701(j), 42 U.S.C. § 2000e(j), was added [to Title VII] in 1972 . . . . It provides that '[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.'" <u>Ansonia Bd. of Educ.</u>, 479 U.S. at 63 n.1. Thus, a "reasonable accommodation duty was incorporated into [Title VII], somewhat awkwardly, in the definition of religion." <u>Id.</u>

In other words, since 1972, Title VII not only has barred "disparate treatment" of employees based on their religion, but it also has imposed upon employers a "'statutory obligation to make reasonable accommodation for the religious observances of [their] employees, short of incurring an undue hardship.'" <u>Firestone Fibers & Textiles Co.</u>, 515 F.3d at 312 (quoting <u>Trans World Airlines, Inc. v. Hardison</u>, 432 U.S. 63, 75 (1977)). <u>See also Chalmers</u>, 101 F.3d at 1018 ("Although Title VII similarly classifies religion, sex, and race as illegal considerations, the definition of 'religion' in the statute places it in a special category."). As a result, the Fourth Circuit has joined other courts in "recogniz[ing] that employees may utilize two theories in asserting religious discrimination claims. These theories are

denominated as the 'disparate treatment' and 'failure to accommodate' theories." <u>Chalmers</u>, 101 F.3d at 1017. <u>See also</u> <u>Reed v. UAW</u>, 569 F.3d 576, 579 (6th Cir. 2009) ("There are two basic types of religious discrimination claims that an individual may bring against a labor union under Title VII: disparate treatment claims and religious accommodation claims."); <u>Morales v. McKesson Health Solutions, LLC</u>, 136 Fed. Appx. 115, 118 (10th Cir. 2005) ("[A] religious accommodation claim is distinct from a 'straightforward disparate treatment' claim.")

In <u>Ricci</u>, the Supreme Court re-enforced the principle that "disparate treatment" claims require proof of "intentional discrimination" and elaborated upon the interplay between an employer's competing concerns about "disparate impact" and "disparate treatment" liability. Nothing in <u>Ricci</u>, however, indicates that courts should classify "religious accommodation" claims as "disparate treatment" claims or that "religious accommodation" claims require proof of "intentional discrimination" in addition to the proof of an employer's failure to reasonably accommodate an employee's religion, <u>see</u> <u>Chalmers</u>, 101 F.3d at 1019 (holding that, to establish a prima facie "religious accommodation" claim, an employee must show: "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; (3) he or she was disciplined for failure to comply with the conflicting employment requirement," and that, "[i]f the employee establishes a prima facie case, the burden then shifts to the employer to show that it

could not accommodate the plaintiff's religious needs without undue hardship" (internal quotation marks omitted)).

Moreover, as noted above, the Fourth Circuit has drawn a clear distinction between "religious accommodation" claims and "disparate treatment" claims. See id. at 1017. Further, the Fourth Circuit has held that, "in the context of employment discrimination litigation, . . . 'intentional discrimination' is treated as synonymous with discrimination resulting in 'disparate treatment' . . . ." Pandazides v. Virginia Bd. of Educ., 13 F.3d 823, 830 n.9 (4th Cir. 1994) (internal citations omitted). Accordingly, in the Fourth Circuit, given that "religious accommodation" claims are distinct from "disparate treatment" claims and that "disparate treatment" claims are "synonymous" with "intentional discrimination" claims, "religious accommodation" claims are not "synonymous" with "intentional discrimination" claims.[21]

An examination of the Fourth Circuit's handling of analogous "disability accommodation" claims under the Americans with Disabilities Act of 1990 ("ADA") confirms this view. See Firestone

---

[21] The Seventh Circuit and at least one district court therein explicitly have made this same point. See Reed v. Great Lakes Cos., Inc., 330 F.3d 931, 934 (7th Cir. 2003) ("Reed has utterly failed to make a prima facie case of intentional religious discrimination. But he has another string to his bow. Besides forbidding intentional discrimination, Title VII requires an employer to try to accommodate the religious needs of its employees, that is, to try to adjust the requirements of the job so that the employee can remain employed without giving up the practice of his religion, provided the adjustment would not work an undue hardship on the employer." (emphasis added)); EEOC v. Oak-Rite Mfg. Corp., No. IP99-1962-C-H/G, 2001 WL 1168156, at *16 (S.D. Ind. Aug. 27, 2001) (unpublished) ("A claim for failure to accommodate does not require any proof of discriminatory intent or animus against the plaintiff's religious beliefs.").

<u>Fibers & Textiles Co.</u>, 515 F.3d at 314 (looking to decision from ADA context in resolving Title VII "religious accommodation" case because Title VII's "religious accommodation" provision is "linguistically similar" to ADA's "disability accommodation" provision). As with Title VII's prescriptions regarding religion, the Fourth Circuit has held that the ADA protects individuals with disabilities by creating "distinct grounds for relief," including both "intentional discrimination or disparate treatment" and "failure to make reasonable accommodations." <u>A Helping Hand, LLC v. Baltimore Cnty., Md.</u>, 515 F.3d 356, 362 (4th Cir. 2008). As this formulation indicates, the Fourth Circuit does not construe claims for "failure to make reasonable accommodations" as requiring proof of "intentional discrimination."

Nor would imposing such a requirement make sense:

> [R]easonable accommodation is a theory of liability separate from intentional discrimination. If the motivation [of the defendants for their actions] was based on [the plaintiff's] handicap [or religion], then [the plaintiff] would have been entitled to judgment under the theory of intentional discrimination . . . . "Failure to reasonably accommodate" is an alternative theory of liability. The theory would be entirely redundant if it required proof that the defendants' actions were motivated by animus towards the handicapped [or persons of a particular religion].

<u>Good Shepherd Manor Foundation, Inc. v. City of Momence</u>, 323 F.3d 557, 562 (7th Cir. 2003). <u>See also</u> <u>Walton v. Mental Health Ass'n of Se. Pa.</u>, No. CIV.A. 96-5682, 1997 WL 717053, at *10 (E.D. Pa. Nov. 17, 1997) (unpublished) ("Under the ADA, failure to accommodate and disparate treatment are analytically distinct claims. In order to establish a violation of the ADA, <u>a claim</u>

brought under failure to accommodate does not require any evidence or inference of intentional discrimination." (emphasis added)).

In light of the foregoing authority, GKN's reliance on <u>Ricci</u> to assign to the EEOC the burden of presenting proof of intentional discrimination to avoid summary judgment on its religious accommodation claim lacks persuasive force.

As quoted above, in addition to citing <u>Ricci</u>, GKN also included a quote from <u>Cary</u> to support its argument that, in order to make out a failure-to-accommodate claim, the EEOC must prove that GKN engaged in intentional discrimination. (Docket Entry 14 at 18-19.) GKN's quotation is reproduced here (underlined) along with its surrounding context:

> Without notice, an employer cannot be found to have acted "because of" the religious conflict. The Fifth Circuit suggested this intention of the statute in <u>Turpen v. Missouri-Kan.-Tex. R. Co.</u>:
>
>> Title VII's prohibition of religious discrimination in employment, *42 U.S.C. § 2000e(j)*, provides that an employer engages in an unfair employment practice if he discriminates against an employee *because of* any aspect of his religious practices or beliefs, unless the employer shows that he cannot "reasonably accommodate" the employee's religious needs without "undue hardship on the conduct of the employer's business."
>
> *736 F.2d 1022, 1026 (5th Cir. 1984)* (emphasis added). <u>The phrase "because of" in this context implies the religious animus that the Civil Rights Act was developed to prevent.</u> It stands to reason then, that a discharge of an employee for failure to comply with valid employment requirements, where the employer does not have sufficient knowledge of an employee's religious beliefs or practice despite the fact that the employer knows that a conflict has arisen, cannot be held to violate the statute.

_Cary_, 908 F. Supp. at 1345-46 (some internal citations omitted, underlined emphasis added, italicized emphasis in original).

As an initial matter, to the extent the cited language from _Cary_ requires proof of intentional discrimination for religious accommodation claims, it conflicts with and must give way to the previously cited Fourth Circuit authority foreclosing that position. Further, _Cary_ can be harmonized with the view that plaintiffs need not prove intentional discrimination to make out an otherwise viable religious accommodation claim. Specifically, the _Cary_ Court explained that, where an employee failed to provide adequate notice of a religious conflict, the employer could not violate the statute; however, the court also implied that, upon proper notice, a failure to provide an accommodation otherwise required under § 2000e(j) would fall within Title VII's prohibition of acts "because of" religion. Because, for reasons previously discussed, GKN has not otherwise shown an entitlement to judgment as a matter of law on the EEOC's failure to accommodate claim, it cannot secure summary judgment under _Cary_'s rationale.

In sum, GKN has not established a right to judgment as a matter of law based on the EEOC's failure to present evidence of intentional discrimination.[22]

---

[22] In light of the foregoing analysis, the Court need not address the EEOC's arguments related to _McDonnell Douglas v. Green_, 411 U.S. 792 (1973) (_see_ Docket Entry 15 at 20).

## III.  CONCLUSION

A genuine dispute exists with respect to the material factual question of whether Butler gave GKN sufficient notice of the religious conflict posed by a saliva test.  Because GKN has not asserted a claim to judgment as a matter of law on any other recognized components of a religious accommodation claim, the Court should decline to grant GKN summary judgment, notwithstanding its contention that the EEOC has failed to prove that GKN otherwise engaged in intentional discrimination.

**IT IS THEREFORE RECOMMENDED** that GKN's Motion for Summary Judgment (Docket Entry 13) be **DENIED**.


                          /s/ L. Patrick Auld
                         **L. Patrick Auld**
                  **United States Magistrate Judge**
December 8, 2010